PALMER, J.
**488 Following his guilty plea to certain violent crimes that he committed on March 22, 2012, the petitioner, Charles Garner, was sentenced to a lengthy prison term. Thereafter, he commenced this habeas action against the respondent, the Commissioner of Correction, claiming that a 2013 amendment to General Statutes (Rev. to 2013) § 54-125a; see Public Acts 2013, No. 13-3, § 59 (P.A. 13-3), codified at General Statutes (Supp. 2014) § 54-125a;[1] which *1140 eliminated risk reduction credit awarded pursuant to General Statutes § 18-98e[2] **489 from the calculation of a violent offender's initial parole eligibility date, as applied retroactively to him, violates the ex post facto clause of the United States constitution,[3] because, under the version of § 54-125a in effect when he committed his offenses, he was entitled to have any such credit that he had earned applied to advance his initial parole eligibility date. The petitioner also claimed that defense counsel in his criminal case rendered ineffective assistance by failing to provide the sentencing court, Alexander, J. , with certain evidence in mitigation of his sentence. The habeas court, Fuger, J. , rejected the petitioner's ex post facto claim, concluding, inter alia, that the risk that the petitioner would suffer a longer period of incarceration as a result of the 2013 amendment was too remote because an award of risk reduction credit is discretionary and any such awarded credit may be revoked by the respondent for cause at any time. The habeas court also concluded that the petitioner could not prevail on his ineffective assistance claim because he did not establish that counsel's performance was either unreasonable or **490 prejudicial. On appeal,[4] the petitioner challenges both of these determinations by the habeas court. Although we reject the petitioner's ineffective assistance claim, we agree that the ex *1141 post facto clause bars the respondent from applying the 2013 amendment retroactively to the petitioner. Accordingly, we reverse in part the judgment of the habeas court.
The following undisputed facts and procedural history are necessary to our resolution of the petitioner's appeal. In the early evening of March 22, 2012, the petitioner arrived at the home of the female victim, his former next-door neighbor whom he had known since childhood, to watch television with her. After spending the evening with the petitioner, the victim asked him to leave because she wanted to go to sleep. The petitioner then struck the victim on the head with a kitchen chair, knocking her unconscious and causing fractures to her eye socket and cheekbone, injuries that required the victim to undergo facial reconstruction and plastic surgery. Before fleeing, the petitioner stole money, credit cards and jewelry from the victim's home.
The petitioner was arrested several days later, and, on September 18, 2012, in accordance with a plea agreement, he pleaded guilty under the Alford doctrine[5] to one count of assault in the first degree and one count of burglary in the first degree. He was represented by Attorney William O'Connor. Under the plea agreement, the state agreed to a sentence not to exceed twenty years of imprisonment. The petitioner retained the right **491 to argue at the time of sentencing that a portion of his sentence should consist of a term of special parole.
At the petitioner's sentencing hearing on November 29, 2012, the state recommended that he receive the maximum sentence of twenty years of imprisonment. The state based its recommendation on the petitioner's criminal history, the severity of the assault, the petitioner's prior failure at rehabilitation, his "feigned remorse" for his actions, and a lack of compelling mitigation evidence. The victim also gave a statement to the sentencing court in which she discussed her twenty-nine year relationship with the petitioner, explaining that they first met when she and her husband moved next door to the home where the petitioner resided with his parents. The victim further explained that, although the petitioner had been a child with "impulse control problems and anger management issues" that ultimately led to criminal activity, she always endeavored to support him, and did so up to and including the evening of the attack, when he arrived at her door ostensibly seeking company and conversation. After describing the petitioner's assault on her and the medical and related challenges it had created, the victim implored the court to impose the maximum sentence. The victim's son also addressed the court, and he, too, requested that the petitioner receive the maximum sentence.
The petitioner's attorney, O'Connor, presented the court with certain mitigation evidence, including the presentence investigative report, a memorandum to aid in sentencing prepared by a social worker employed by the Office of the Public Defender, and a mental health evaluation of the petitioner prepared by Andrew W. Meisler, a clinical and forensic psychologist. Each of these documents detailed the significant challenges that the petitioner had faced throughout his life, which included an alcoholic, physically abusive father, various **492 mental health diagnoses including schizoaffective disorder, an instance of *1142 serious sexual abuse as a child, a lifelong struggle with addiction to alcohol and drugs, and difficulty maintaining employment. O'Connor also submitted several letters of support for the petitioner written by friends and family, all of whom described the petitioner as a kind and decent person whose attack on the victim was out of character and undoubtedly the result of his untreated mental illness. Although supporters of the petitioner attended his sentencing, none spoke on his behalf.[6]
Before imposing the petitioner's sentence, the court noted, first, that it had considered all of the sentencing materials that the parties had submitted. The court then discussed the "extremely violent" nature of the assault on the victim and the fact that the petitioner had inflicted violence on someone who had shown him compassion throughout his life. The court also disagreed with the petitioner's counsel and family members that the petitioner had never "displayed a degree of violence in the past," observing that, before the attack on the victim, the petitioner had exhibited "at least [a] propensity or proclivity to engage in conduct that creates a serious risk of injury to person ...." Finally, the court expressed concern about the petitioner's "long history of ... criminal conduct" and failure to comply with the treatment recommendations of various mental health professionals, including his failure to take the psychotropic medications that had been prescribed to him. In light of these considerations, the court sentenced the petitioner to a total effective prison term of eighteen years followed by two years of special parole, a sentence the court deemed necessary to protect society and to ensure that the petitioner's "rehabilitative efforts"
**493 are "strictly supervised in a correctional setting and then by special parole."
The following additional facts, which are set forth in the companion case of Breton v. Commissioner of Correction , 330 Conn. 462, 196 A.3d 789, 2018 WL 6287923 (2018), also released today, are relevant to the petitioner's ex post facto claim. "In 2011, before the petitioner committed his offenses, the legislature passed No. 11-51 of the 2011 Public Acts (P.A. 11-51), § 22, codified at General Statutes § 18-98e. Section 18-98e (a) provides that certain inmates who were convicted of crimes committed on or after October 1, 1994, 'may be eligible to earn risk reduction credit toward a reduction of such person's sentence, in an amount not to exceed five days per month, at the discretion of the Commissioner of Correction ....' In addition, in 2011, General Statutes (Rev. to 2011) § 54-125a (b) provided that a person convicted of a violent crime was ineligible for parole until such person served at least 85 percent of the definite sentence imposed. The legislature amended that provision in 2011 to allow the application of 'any risk reduction credit earned under the provisions of [ § 18-98e ]'; P.A. 11-51, § 25; to accelerate the date on which a violent offender would become eligible for parole. Accordingly, when the petitioner committed the offenses for which he is imprisoned, earned risk reduction credit was to be applied by the respondent both to reduce the length of a violent offender's sentence and to advance his or her initial parole eligibility date....
"In 2013, after the petitioner was sentenced, the legislature again amended § 54-125a (b) (2), this time by removing the phrase 'less any risk reduction credit earned under the provisions of [§] 18-98e.'
*1143 P.A. 13-3, § 59. Thus, under the 2013 amendment, violent offenders are still eligible to earn risk reduction credit to reduce their definite sentence, but that credit is no longer applied to advance their initial parole eligibility **494 date. Consequently, when P.A. 13-3, § 59, became effective on July 1, 2013, inmates convicted of a violent offense thereafter were required to complete 85 percent of their definite sentence before they became eligible for parole." (Citation omitted.) Breton v. Commissioner of Correction , supra, 330 Conn. at 467-68, 196 A.3d 789.
On May 16, 2016, the petitioner filed an amended petition for a writ of habeas corpus, alleging that O'Connor had provided ineffective assistance of counsel by failing to arrange for the petitioner's cousin, William J. Brathwaite, Jr., to speak on his behalf at his sentencing hearing.[7] The petitioner also claimed that the 2013 amendment to General Statutes (Rev. to 2013) § 54-125a (b) (2), as applied to him, violates the ex post facto clause because the amendment retroactively increases the amount of time he is required to serve before becoming eligible for parole.
At his habeas trial, the petitioner testified in support of his claim of ineffective assistance of counsel that, prior to sentencing, he had provided O'Connor with the names of several individuals who he believed would be willing to write or address the court on his behalf, including his cousin, Brathwaite. The petitioner further testified that Brathwaite had told him that he would be willing to attend the sentencing hearing and to speak on the petitioner's behalf, and that he had expected O'Connor to arrange for Brathwaite's attendance.
During his testimony at the habeas trial, Brathwaite explained that no one from O'Connor's office ever contacted him and that he would have attended and spoken at the sentencing hearing if he had known about it.
**495 Brathwaite further testified that the petitioner was raised primarily by his sister and "had a ... really lousy childhood [due to] a largely absentee father who forbade most contact with his mother.... [H]is father's upbringing ... was extremely violent, and he visited that upon his family, and his attitude was, I survived it-you know, now you have to, too." Brathwaite also testified that the petitioner had lived with and worked for him for many years prior to his attack on the victim and that, during that period of time, the petitioner was an exemplary employee and was otherwise "fully functional." According to Brathwaite, the petitioner appeared normal, conversant and lucid in the days before the offense, and his attack on the victim was "completely out of character for him."
O'Connor also testified and stated that the petitioner knew that the court, in accordance with the petitioner's plea agreement, would impose a twenty year sentence but that the petitioner would have the right to argue that a portion of that sentence should consist of a term of special parole. O'Connor further explained that, prior to sentencing, he had informed the petitioner's family that it was extremely important that they obtain letters of support for the petitioner to present to the sentencing court. Five such letters ultimately were submitted to the court on the petitioner's behalf.
Finally, in support of his ex post facto claim, the petitioner presented the testimony of Michelle Deveau, a records specialist with the Department of Correction (department), who testified that, although *1144 discretionary, risk reduction credit is awarded by the respondent routinely and that each month, the department's computer system automatically posts it to the timesheets of eligible inmates. The petitioner also adduced testimony from Heidi Palliardi, a supervisor with the department's Sentence Calculation and Interstate Management Unit, who explained that the petitioner has been and remains **496 fully eligible for risk reduction credit and that, at the time of the habeas trial, already had earned 192 such credits. She also testified that earned risk reduction credit is subject to forfeiture, in the discretion of the respondent and after notice and a hearing, for failure to comply with institutional rules. It is undisputed, however, that the petitioner has been awarded all of the risk reduction credits for which he was eligible up to the time of the habeas trial, and there is nothing in the record to suggest that the petitioner was unlikely to continue to earn such credit.
The habeas court rejected both of the petitioner's claims. With respect to the ineffective assistance claim, the court found that O'Connor had appropriately "reached out to the petitioner's family members to rally their support ... at the sentencing" and that his failure also to contact Brathwaite was in no way unreasonable. More specifically, the court stated that "[t]here was nothing presented at the habeas trial that was new or substantively different from what was presented to the sentencing court" and that Braithwaite's habeas trial testimony was merely "repetitive or duplicative" of "what was presented to the sentencing court in letters from the petitioner's family members." The habeas court also concluded that the petitioner had failed to establish an ex post facto violation because, inter alia, the risk that the petitioner will suffer increased punishment as a result of the 2013 amendment to General Statutes (Rev. to 2013) § 54-125a (b) (2), the necessary predicate to his ex post facto claim, is entirely speculative due to the fact that the award of risk reduction credit is discretionary and the fact that such credit may be revoked by the respondent at any time for cause.
On appeal, the petitioner claims that the habeas court incorrectly determined that he had failed to establish his ineffective assistance claim because there is a reasonable probability that he would have received a lesser **497 sentence if Brathwaite had addressed the court on his behalf. In particular, he contends that Brathwaite's statement to the court would have "humaniz[ed]" him in ways that the other mitigation evidence did not, and that it also would have "[cast] doubt" on the state's characterization of him as "strung out on drugs and searching for ... drug money" at the time of the offense. With respect to his contention under the ex post facto clause, the petitioner reasserts his claim that there is a sufficient likelihood that the 2013 amendment to General Statutes (Rev. to 2013) § 54-125a, if applied to him, would result in a later parole eligibility date than would be the case upon application of the version of § 54-125a in effect when he committed the crimes for which he is now imprisoned.
I
EX POST FACTO CLAIM
The petitioner's ex post facto claim is controlled by our decision today in Breton v. Commissioner of Correction , supra, 330 Conn. at ----, 196 A.3d 789, in which we address precisely the same ex post facto claim as we do in the present case and conclude, contrary to the determination of the habeas court, that the ex post facto clause prohibits the respondent from applying the 2013 amendment to General Statutes (Rev. to 2013) § 54-125a (b) (2) to violent offenders who, like the petitioner, committed their offenses between the effective dates of the 2011 and *1145 2013 amendments to that statutory provision. See id., at ----, 196 A.3d 789. The ex post facto clause prohibits the retroactive application of laws, including laws governing early release and parole eligibility, that impose a more onerous punishment on a defendant than the laws in existence at the time of the commission of the offense. Id., at ----, ----, 196 A.3d 789. As we explain in Breton, "it is unconstitutional to apply a statute that alters, to the defendant's disadvantage, the terms under which eligibility for **498 [parole] is calculated, if that statute was enacted after the date of the underlying offense" (internal quotation marks omitted) id., at 473, 196 A.3d 789 ; and "it cannot reasonably be argued that the 2013 amendment to General Statutes (Rev. to 2013) § 54-125a (b) (2) does not alter the calculation of when [the petitioner] is eligible for parole .... It clearly does so by eliminating risk reduction credit from that calculation. Indeed, the petitioner has consistently earned the maximum number of risk reduction credits that were available to him, and the respondent has provided no reason to believe either that the petitioner will be denied risk reduction credit in the future or that any credit that he earns or already has earned is likely to be revoked. In such circumstances, it strikes us as quite speculative to conclude that the petitioner's release date will not be adversely affected by retroactively applying the 2013 amendment to him." (Citation omitted; emphasis in original; internal quotation marks omitted.) Id., at 478, 196 A.3d 789. Accordingly, we agree with the petitioner that the 2013 amendment to General Statutes (Rev. to 2013) § 54-125a (b) (2), as applied retroactively to him, violates the ex post facto clause.[8]
II
INEFFECTIVE ASSISTANCE OF COUNSEL
The petitioner also asserts that the habeas court incorrectly concluded that O'Connor did not render **499 ineffective assistance by virtue of his failure to arrange for Brathwaite to speak on the petitioner's behalf at the sentencing hearing. According to the petitioner, if Brathwaite had addressed the court, there is a reasonable probability that the petitioner would have received a lesser sentence. We disagree.
"The issue of whether the representation that a defendant received at trial was constitutionally inadequate is a mixed question of law and fact.... As such, the question requires plenary review unfettered by the clearly erroneous standard....
"The sixth amendment [to the United States constitution] provides that in all criminal prosecutions, the accused shall enjoy the right to the effective assistance of counsel.[9] ... Under the two-pronged ... test [set forth in *1146 Strickland v. Washington , 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984) ], a defendant can ... prevail on an ineffective assistance of counsel claim [only] if he proves [both] that (1) counsel's performance was deficient, and (2) the deficient performance resulted in actual prejudice.... To demonstrate deficient performance, a defendant must show that counsel's conduct fell below an objective standard of reasonableness for competent attorneys.... To demonstrate actual prejudice, a defendant must show a reasonable probability that the outcome of the proceeding would have been different but for counsel's errors." (Citations omitted; footnote added; internal quotation marks omitted.) Davis v. Commissioner of Correction , 319 Conn. 548, 554-55, 126 A.3d 538 (2015), cert. denied sub nom. Semple v. Davis , --- U.S. ----, 136 S.Ct. 1676, 194 L.Ed.2d 801 (2016). It is well established that a **500 criminal defendant's right to the effective assistance of counsel includes the right to have counsel conduct "a thorough investigation of the defendant's background" in order that evidence in mitigation of punishment may be uncovered; Williams v. Taylor , 529 U.S. 362, 396, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000) ; and the United States Supreme Court repeatedly has held that counsel's failure to perform such an investigation constitutes deficient performance. See, e.g., id. ; see also Porter v. McCollum , 558 U.S. 30, 40, 130 S.Ct. 447, 175 L.Ed.2d 398 (2009) ("[t]he decision not to investigate did not reflect reasonable professional judgment").
Applying these principles to the present facts, we agree with the habeas court that O'Connor was not deficient in failing to arrange for Brathwaite to attend and speak at the petitioner's sentencing. This is so because, as the habeas court explained, Brathwaite's testimony was wholly cumulative of the mitigation evidence already before the sentencing court. For example, Brathwaite's testimony regarding the petitioner's difficult childhood mirrored the information contained in the memorandum to aid in sentencing and in the mental health evaluation, both of which apprised the sentencing court about the petitioner's troubled past in considerably more detail than Brathwaite's habeas testimony.[10] Likewise, Brathwaite's testimony vouching for the petitioner's good character and work ethic and **501 his explanation that the conduct at issue was completely out of character were entirely repetitive of the sentiments expressed in the several letters that were submitted in support of the petitioner. For example, the petitioner's sister, Yvette Garner, wrote that the petitioner is "an amazing man who is kind, loving, caring ... and generous to a fault." Two of the petitioner's cousins, Valerie Brathwaite and Cheryl DeSorbo, similarly described the petitioner as "a caring, kind, friendly man who enjoys spending time helping *1147 family and friends." Ann LeBlanc, a family friend, wrote that she was "very shocked" to learn of the petitioner's attack on the victim, explaining that the crime was not at all consistent with the "caring and thoughtful" person she knew the petitioner to be.
Thus, the record fully supports the determination of the habeas court that one more attestation to the petitioner's good character and troubled childhood would not have made any difference to the sentencing court, such that it simply was unnecessary for O'Connor to call on Braithwaite to speak on the petitioner's behalf at the sentencing hearing. Indeed, the sentencing court expressly rejected the claims of defense counsel and the petitioner's family that the petitioner's attack on the victim was out of character, concluding, instead, that the sentence imposed was necessary to ensure that the petitioner would not harm anyone else and would receive the mental health treatment he required in a "strictly supervised ... correctional setting and then by special parole." The petitioner's ineffective assistance claim therefore must fail.
The judgment is reversed with respect to the petitioner's ex post facto claim and the case is remanded to the habeas court with direction to render judgment granting the petition as to that claim; the judgment is affirmed in all other respects.
In this opinion the other justices concurred.

General Statutes (Supp. 2014) § 54-125a provides in relevant part: "(b) (1) No person convicted of any of the following offenses, which was committed on or after July 1, 1981, shall be eligible for parole under subsection (a) of this section: (A) Capital felony, as provided under the provisions of section 53a-54b in effect prior to April 25, 2012, (B) murder with special circumstances, as provided under the provisions of section 53a-54b in effect on or after April 25, 2012, (C) felony murder, as provided in section 53a-54c, (D) arson murder, as provided in section 53a-54d, (E) murder, as provided in section 53a-54a, or (F) aggravated sexual assault in the first degree, as provided in section 53a-70a. (2) A person convicted of (A) a violation of section 53a-100aa or 53a-102, or (B) an offense, other than an offense specified in subdivision (1) of this subsection, where the underlying facts and circumstances of the offense involve the use, attempted use or threatened use of physical force against another person shall be ineligible for parole under subsection (a) of this section until such person has served not less than eighty-five per cent of the definite sentence imposed...."

General Statutes § 18-98e provides in relevant part: "(a) Notwithstanding any provision of the general statutes, any person sentenced to a term of imprisonment for a crime committed on or after October 1, 1994, and committed to the custody of the Commissioner of Correction on or after said date, except a person sentenced for a violation of section 53a-54a, 53a-54b, 53a-54c, 53a-54d, 53a-55, 53a-55a, 53a-70a, 53a-70c or 53a-100aa, or is a persistent dangerous felony offender or persistent dangerous sexual offender pursuant to section 53a-40, may be eligible to earn risk reduction credit toward a reduction of such person's sentence, in an amount not to exceed five days per month, at the discretion of the Commissioner of Correction for conduct as provided in subsection (b) of this section occurring on or after April 1, 2006.
"(b) An inmate may earn risk reduction credit for adherence to the inmate's offender accountability plan, for participation in eligible programs and activities, and for good conduct and obedience to institutional rules as designated by the commissioner, provided (1) good conduct and obedience to institutional rules alone shall not entitle an inmate to such credit, and (2) the commissioner or the commissioner's designee may, in his or her discretion, cause the loss of all or any portion of such earned risk reduction credit for any act of misconduct or insubordination or refusal to conform to recommended programs or activities or institutional rules occurring at any time during the service of the sentence or for other good cause. If an inmate has not earned sufficient risk reduction credit at the time the commissioner or the commissioner's designee orders the loss of all or a portion of earned credit, such loss shall be deducted from any credit earned by such inmate in the future...."

Article one, § 10, of the United States constitution provides in relevant part: "No State shall ... pass any ... ex post facto Law ...."

The petitioner, on the granting of certification, appealed from the judgment of the habeas court to the Appellate Court, and we transferred the appeal to this court pursuant to General Statutes § 51-199 (c) and Practice Book § 65-2.

Under North Carolina v. Alford , 400 U.S. 25, 91 S.Ct. 160, 27 L.Ed.2d 162 (1970), "[a]n individual accused of [a] crime may voluntarily, knowingly, and understandingly consent to the imposition of a prison sentence even if he is unwilling or unable to admit his participation in the acts constituting the crime." Id., at 37, 91 S.Ct. 160.

When the court inquired whether anyone wished to speak on behalf of the petitioner at the sentencing hearing. O'Connor responded that "[t]here are people here to support him, but they do not wish to speak ...."

The petitioner also claimed that O'Connor had provided ineffective assistance by failing to advise him regarding the availability of sentence review and to pursue such review on his behalf. The habeas court rejected this claim, and the petitioner has not raised that claim on appeal from the habeas court's judgment.

We note that the habeas court also concluded that the petitioner could not prevail on his ex post facto claim, first, because the 2011 amendment to General Statutes (Rev. to 2011) § 54-125a; see Public Acts 2011, No. 11-51, § 25; was never intended to apply to violent offenders, and, second, because mandating that the respondent apply risk reduction credit to advance the petitioner's parole eligibility date would require the court to "enmesh itself" in matters of prison administration that are exclusively within the province of the respondent. Neither of these reasons is meritorious. As we explain in Breton ; see Breton v. Commissioner of Correction , supra, 330 Conn. at 469 n.5, 196 A.3d 789 ; the court's first reason is belied by the plain language of the 2011 amendment to General Statutes (Rev. to 2011) § 54-125a, and the court's second reason fails because the necessarily broad discretion afforded prison officials in the area of prison administration does not include the discretion to apply our laws in violation of an inmate's ex post facto rights.

This right is made applicable to the states through the due process clause of the fourteenth amendment to the United States constitution. See, e.g., State v. Vega , 259 Conn. 374, 386, 788 A.2d 1221, cert. denied, 537 U.S. 836, 123 S.Ct. 152, 154 L.Ed.2d 56 (2002).

For example, the memorandum to aid in sentencing provided that the petitioner "already started 'behind the eight ball' when he was born, as he was born into an abusive and mentally challenged family. His mother was clinically depressed, and his father was an alcoholic who was physically and emotionally abusive to every family member. Before he knew the difference between right and wrong, he was sexually molested by a stranger in the public library." That memorandum further provided that the petitioner "started off drinking at the very young age of eight after being 'pushed' [in]to drinking by his father and a group of his father's friends." The petitioner's substance abuse also was discussed in his mental health evaluation, in which it was noted that the petitioner began drinking alcohol at the age of five, smoking marijuana at the age of thirteen, and using cocaine at the age of fifteen.