30            **JANUARY, 2026**            354 Conn. 30

Grant *v.* Commissioner of Correction

# CECIL GRANT *v.* COMMISSIONER
# OF CORRECTION
# (SC 21019)

Mullins, C. J., and McDonald, D'Auria, Ecker,
Alexander and Dannehy, Js.

*Syllabus*

The petitioner, who had been convicted of conspiracy to commit robbery in
the first degree, attempt to commit robbery in the first degree, and assault
in the first degree in connection with the shooting of a pizza delivery driver,
sought a writ of habeas corpus, claiming, inter alia, that his trial counsel, C,
had rendered ineffective assistance. At the petitioner's criminal trial, the
defense theory was that another individual, D, with whom the petitioner was
visiting on the night of the shooting, had committed the charged offenses,
but D testified that it was the petitioner who had made plans to rob a delivery
driver and who had used D's cell phone to call and case various businesses,
including the pizza restaurant that employed the victim. The habeas court
denied the habeas petition, and the petitioner, on the granting of certifica-
tion, appealed to the Appellate Court, which affirmed the habeas court's
judgment. Although the Appellate Court agreed with the petitioner's claim
that C had rendered ineffective assistance by failing to adequately investigate
D's cell phone records, a majority of that court ultimately concluded that
the petitioner had failed to establish that he was prejudiced by C's deficient
performance. On the granting of certification, the petitioner appealed to
this court, challenging the Appellate Court's determination on the issue
of prejudice. *Held*:

The Appellate Court incorrectly concluded that the petitioner had failed to
establish prejudice stemming from C's failure to investigate D's cell phone
records, as there was a reasonable probability that, but for C's failure to
undertake such an investigation and to introduce some or all of the records
at trial, the jury would have had a reasonable doubt with respect to the peti-
tioner's guilt, and, accordingly, this court reversed the Appellate Court's
judgment and remanded the case with direction that the habeas court grant
the habeas petition, vacate his convictions, and order a new trial.

The state's case at the petitioner's criminal trial rested in significant part
on D's account of the events leading up to and following the shooting, D's
testimony that the petitioner had used D's cell phone to order the pizza was
central to the state's theory connecting the petitioner to the victim, and,
if D's phone records had been admitted into evidence, the jury would have
learned that D's phone had not been used on the night in question to call the
pizza restaurant that employed the victim, or any other business, and this
evidence would have served to significantly discredit D's account of what
had transpired and, in turn, D's credibility.

Moreover, the introduction into evidence of D's cell phone records showing
that no call was made from D's phone to the pizza restaurant that employed

Grant *v.* Commissioner of Correction

the victim on the night in question would have undermined the corroborating testimony of S, a detective who testified that D's cell phone had been used that night to call the pizza restaurant, thereby further weakening the state's case.

Furthermore, D's cell phone records also revealed that his cell phone was not in use at the time of the incident, thereby supporting the reasonable inferences that D was one of the assailants and had stopped using his phone during that period, which, in turn, would have bolstered the petitioner's third-party culpability defense.

There was no merit to the claims of the respondent, the Commissioner of Correction, that prejudice could not adequately be assessed due to the petitioner's failure to call D and S to testify at the habeas trial, and that the evidence the petitioner produced at the habeas trial did not establish that no calls were placed from D's cell phone to any business on the night of the incident in question.

Argued October 31, 2025—officially released January 20, 2026

*Procedural History*

Amended petition for a writ of habeas corpus, brought to the Superior Court in the judicial district of Tolland and tried to the court, *M. Murphy, J.*; judgment denying the petition, from which the petitioner, on the granting of certification, appealed to the Appellate Court, *Cradle* and *Suarez, Js.*, with *Prescott, J.*, concurring in part and dissenting in part, which affirmed the habeas court's judgment, and the petitioner, on the granting of certification, appealed to this court. *Reversed*; *judgment directed*.

*Norman A. Pattis*, with whom, on the brief, was *James B. Streeto*, senior assistant public defender, for the appellant (petitioner).

*Laurie N. Feldman*, assistant state's attorney, with whom, on the brief, were *Sharmese L. Walcott*, state's attorney, and *Donna Marie Fusco*, assistant state's attorney, for the appellee (respondent).

*Opinion*

DANNEHY, J. The petitioner, Cecil Grant, appeals from the judgment of the Appellate Court, which affirmed the habeas court's judgment denying his amended petition for a writ of habeas corpus alleging ineffective

Grant *v.* Commissioner of Correction

assistance of counsel at the trial that resulted in his conviction on robbery and assault charges. He claims that, although the Appellate Court correctly determined that his trial counsel performed deficiently by failing to investigate the cell phone records of a key state's witness and by failing to meet with and interview additional alibi witnesses, it erred in concluding that he had failed to establish the requisite prejudice under *Strickland* v. *Washington*, 466 U.S. 668, 694, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984), to entitle him to a new trial.[1] We agree with the petitioner and, accordingly, reverse the judgment of the Appellate Court.

I

Based on the evidence introduced at the petitioner's criminal trial, the jury reasonably could have found the following underlying facts. At approximately 10 p.m. on April 30, 2011, the petitioner, along with Derek Newkirk and Mike Anderson, was visiting with Gustin Douglas at Douglas' apartment, located at 502 Mary Shepard Place in Hartford. During the visit, the petitioner and Newkirk discussed their need for money and deliberated over which nearby restaurants and businesses might employ delivery drivers who typically carried cash and, thus, could be targeted for a potential robbery. The petitioner then took Douglas' cell phone from him and used it to place calls to various restaurants in an effort to

_____

[1] We granted the petitioner's petition for certification to appeal, limited to the following issues: (1) "Did the Appellate Court correctly conclude that the petitioner had failed to establish prejudice on the basis of trial counsel's deficient performance in failing to investigate the cell phone records of a state's witness?" (2) "Did the Appellate Court correctly conclude that the petitioner had failed to establish his claim of ineffective assistance of counsel on the basis of trial counsel's failure to present additional alibi testimony?" And (3) "[i]f the petitioner has established deficient performance with respect to both his cell phone records and alibi testimony claims but has not independently established prejudice with respect to each of those claims, should this court consider the cumulative effect of the deficiencies in evaluating whether the prejudice prong has been satisfied under *Strickland* v. *Washington*, [supra, 466 U.S. 687]?" *Grant* v. *Commissioner of Correction*, 349 Conn. 912, 912–13, 314 A.3d 1018 (2024).

Grant *v.* Commissioner of Correction

determine which delivery drivers might carry money on them. This led the petitioner to order a pizza from Pizza 101 on Albany Avenue in Hartford. While in Douglas' apartment awaiting the delivery, the petitioner produced a revolver, waving it around and passing it back and forth with Newkirk before placing it in the pocket of the petitioner's hooded sweatshirt. Shortly thereafter, the petitioner and Newkirk left the apartment to meet the delivery driver; Douglas and Anderson remained inside.

At approximately midnight on the morning of May 1, 2011, the victim, a delivery driver for Pizza 101, arrived in the area of 502 Mary Shepard Place. She initially had difficulty locating the address and telephoned the cell phone number listed on the order slip. A male voice answered and provided directions. Upon her arrival, the petitioner approached the front passenger side of her vehicle, with Newkirk standing nearby. Both men had uncovered faces that were visible to the victim. The petitioner addressed the victim through the open passenger side window, asking several times whether she had change. She repeatedly responded that she did not. The petitioner then displayed a revolver and stated, "well, gimme this," while simultaneously attempting to open the front passenger door of the victim's vehicle. Upon seeing the revolver, the victim attempted to flee. As she drove away, the petitioner began firing. Five bullets entered the vehicle, striking the victim in the neck, chin, shoulder, and arm. Because Mary Shepard Place is a dead-end street, the victim was required to turn her vehicle around and pass by the petitioner and Newkirk to escape. She thereafter drove herself to a hospital. Meanwhile, the petitioner and Newkirk returned to Douglas' apartment. Douglas, who had heard a "big boom," observed that both men appeared nervous, though no discussion ensued about what had occurred outside.

Police officers were dispatched to the hospital, where they photographed and secured the victim's vehicle. A detective subsequently interviewed the victim, who identified her shooter as a Black male of light to medium

Grant *v.* Commissioner of Correction

complexion, with short hair and a skinny build, who was about five feet, six inches tall, between sixteen and seventeen years old, and wearing jeans and a black hooded sweatshirt over a shirt with a design on it. The police traced the cell phone number that the victim had called for directions, which led them to Douglas, who used the cell phone associated with that number. Douglas provided an account of his interactions with the petitioner and Newkirk on the night of the shooting and identified both individuals in photographic arrays, causing the police to consider them suspects. The police later presented photographic arrays to the victim, who likewise identified the petitioner and Newkirk.

The petitioner was arrested and charged with conspiracy to commit robbery in the first degree, attempt to commit robbery in the first degree, and assault in the first degree. Represented by Attorney Kirstin B. Coffin, the petitioner proceeded to trial at which Coffin pursued the defenses of misidentification and alibi, as well as a third-party culpability defense. The petitioner's theory was that Douglas, not the petitioner, was guilty of the charged offenses.

The petitioner was found guilty of all three charges. He was sentenced to sixty years of incarceration, suspended after forty years, followed by five years of probation. The petitioner appealed to the Appellate Court, which affirmed the judgment of the trial court. *State* v. *Grant*, 154 Conn. App. 293, 329, 112 A.3d 175 (2014). This court denied his petition for certification to appeal. *State* v. *Grant*, 315 Conn. 928, 109 A.3d 923 (2015).

On August 2, 2019, the petitioner filed the operative, amended petition for a writ of habeas corpus, claiming, inter alia, that his constitutional right to effective assistance of counsel was violated because his trial counsel had (1) failed to adequately and properly investigate the phone records of Douglas, and (2) failed to adequately investigate or present alibi witnesses who could confirm

354 Conn. 30          JANUARY, 2026          35

Grant *v.* Commissioner of Correction

that the petitioner was not present at 502 Mary Shepard Place at the time of the shooting.

At the petitioner's habeas trial, the petitioner's habeas counsel introduced Douglas' cell phone records from the night in question along with the testimony and investigation report of Michael Udvardy, a licensed private investigator who had reviewed Douglas' phone records. Although Douglas testified numerous times at the petitioner's criminal trial that the petitioner had taken his phone and used it to call various businesses, including to order a pizza from Pizza 101, Udvardy testified that the cell phone records show that Douglas' cell phone was not in fact used that night to call Pizza 101 or any other business establishment.

The petitioner also introduced the transcripts from his criminal trial, which included the testimony of William J. Siemionko, a detective with the Hartford Police Department. Siemionko testified that, after learning that the victim had called the phone number listed on the pizza order slip upon arriving at 502 Mary Shepard Place, Siemionko sought to identify the subscriber information for that number. His investigation revealed that the number was associated with Douglas. Although the state did not introduce Douglas' cell phone records at trial, Siemionko testified that Douglas' cell phone had placed a call to Pizza 101 prior to the pizza delivery.[2]

When the petitioner's trial counsel was asked at the habeas trial whether she had received or seen a copy of Douglas' cell phone records or otherwise reviewed them, she first equivocated in answering the questions but

---

[2] The following colloquy took place at the petitioner's criminal trial:

"[The Prosecutor]: . . . [W]ere you . . . able to obtain phone records, calls being received or made by [Douglas'] phone . . . ?

"[Siemionko]: Yes, sir, I did.

"[The Prosecutor]: And were you able to determine whether or not [Douglas'] phone had made calls to Pizza 101 prior to 12 midnight . . . ?

"[Siemionko]: Yes, sir.

"[The Prosecutor]: And what is the result of that?

"[Siemionko]: That they did call Pizza 101 prior to the pizza deliver[y] . . . ."

Grant *v.* Commissioner of Correction

eventually clarified that, although the phone records were available to her in discovery, she never reviewed them. When asked whether she ever considered offering the cell phone records at trial, she responded that she is "a little [wary] in general of offering phone records" because such records can sometimes "prove to be dangerous." She indicated that she once had a prior case in which she offered phone records into evidence but that their admission "backfired" because the state had brought in more phone records that were damaging to her client.

The petitioner also called Brian Carlow, an experienced criminal defense attorney, to testify. In Carlow's view, a competent criminal defense attorney would have reviewed Douglas' cell phone records because it was Douglas' testimony that established that the petitioner purportedly used Douglas' cell phone to place an order with Pizza 101. Carlow opined that the cell phone records, which revealed that no such call was made from Douglas' phone, would have been vital to the defense because the records were incontrovertible and neutral evidence that Douglas' account of events was not truthful.

As to the petitioner's claim that his trial counsel rendered ineffective assistance for failing to adequately investigate and to present the testimony of additional alibi witnesses, the petitioner called Aleja Rivera to testify. Rivera is the daughter of Vanessa Cooper, the sole alibi witness (other than the petitioner himself) who testified at the petitioner's criminal trial.[3] Rivera testified that she was fifteen years old on April 30, 2011, and that the petitioner was at her home, located at 805 Mary Shepard Place, that day. She indicated that, at some point between approximately 9 and 10 p.m. that evening, but definitely before 11 p.m., she went with her

---

[3] Cooper, the fiancé of the petitioner's brother, testified that the petitioner was at her house at 805 Mary Shepard Place for a little while in the afternoon or evening of April 30, 2011. She explained that the petitioner then left her house for a couple of hours and returned "no later than 10, 10:30." Cooper then stated that she, along with her two children, drove the petitioner back to his home on Orange Street in Hartford sometime before 11 p.m. that evening.

Grant *v*. Commissioner of Correction

older brother and her mother to drop off the petitioner at his home, which was located approximately ten to fifteen minutes from where they lived. She stated that her brother, who was seventeen years old at the time, was the one who drove the vehicle, as her mother was not driving at that time. Rivera testified that no one on the petitioner's legal team contacted her prior to or during the trial.

When the petitioner's trial counsel was asked whether she talked to or otherwise investigated Rivera or her brother as potential alibi witnesses, she replied that she had not. Although she could not recall the reasons why she did not talk to or otherwise present Rivera or her brother as alibi witnesses, she indicated that, in general, she did not "like having people underage testify" because she believed that it is "a little bit risky." She explained that "[i]t might look bad in front of the jury if the jury thinks you're hauling in children to testify" and that children may be "nervous [on the] stand" or otherwise change their stories. She said she probably made the strategic decision not to talk with Cooper's children because she had determined that "Cooper's testimony would probably be enough." When asked whether she knew how old Rivera and her brother were at the time of the petitioner's trial, she indicated that she could not recall but that she knew that they were younger than eighteen years old.

The petitioner's habeas counsel asked Carlow about trial counsel's decision not to call Rivera to testify at the petitioner's criminal trial. Carlow opined that there was "absolutely no reason you would not put that testimony in front of the jury, none." He stated that, "if a witness is of very tender years, four, five, six years old, then I think you've got some assessment to do, then you've got some thought." But he indicated that the alibi witnesses in this case were not of tender years. He opined that "[t]he

Grant *v.* Commissioner of Correction

fact that someone's under the age of eighteen—and in this case fifteen and seventeen—plays absolutely no part whatsoever in reasonable counsel's assessment as to whether to put them on." In his view, "[i]f you have a fifteen year old, the sixteen year old, the fourteen year old who has important information to help establish one of the defenses you're presenting, it's not even a strategic decision. There would be no reason not to put them on to support that defense."

Following the petitioner's habeas trial, the habeas court issued a written decision, denying the petitioner's petition for a writ of habeas corpus. The court held that the petitioner failed to demonstrate that his trial counsel's conduct fell outside the wide range of reasonable professional conduct or that he suffered any prejudice.

The petitioner appealed to the Appellate Court. All three judges of the panel agreed with the petitioner that his trial counsel's performance had been deficient. *Grant* v. *Commissioner of Correction*, 225 Conn. App. 55, 76–77, 82, 314 A.3d 1 (2024); id., 89–90 (*Prescott, J.*, concurring in part and dissenting in part). Specifically, the Appellate Court concluded that trial counsel's decision not to investigate Douglas' phone records was unreasonable because "[a] fear of discovering evidence that might harm the client is not a proper basis for neglecting to investigate." Id., 77. The court also concluded that trial counsel "should have, at a minimum, met with and interviewed Cooper's children to ascertain the potential benefit, if any, to having them testify on the petitioner's behalf," although it did not expressly state that trial counsel's performance was deficient for this reason. Id., 82.

The Appellate Court, however, divided on the question of prejudice. A majority of the court concluded that the petitioner had failed to establish that he was prejudiced by trial counsel's errors. Id., 73–74, 82–83. But Judge

354 Conn. 30 JANUARY, 2026 39

Grant *v.* Commissioner of Correction

Prescott, in dissent, disagreed with the majority's prejudice assessment. Id., 86–87 (*Prescott*, *J.*, concurring in part and dissenting in part). He opined that, "[i]f [trial counsel] had properly investigated Douglas' phone records, she would have learned that Douglas' phone was not used on the night in question to call and case potential robbery victims, and most certainly not to call the pizza restaurant that employed the victim." Id., 100 (*Prescott*, *J.*, concurring in part and dissenting in part). Judge Prescott explained that this evidence "would have allowed defense counsel to directly contradict not only the testimony of Douglas but the corroborating testimony provided by . . . Siemionko . . . ." Id., 88 (*Prescott*, *J.*, concurring in part and dissenting in part). In his view, this evidence would have "discredited [Douglas] in the eyes of the jurors" and "impeache[d]" Siemionko. Id., 101 (*Prescott*, *J.*, concurring in part and dissenting in part).

As to trial counsel's failure to investigate additional alibi witnesses, Judge Prescott disagreed with the majority's suggestion that introducing additional alibi witnesses makes those witnesses' testimony per se cumulative of the testimony of other alibi witnesses. Id., 107 (*Prescott*, *J.*, concurring in part and dissenting in part). Judge Prescott opined that "[a]n alibi defense . . . certainly may be rendered more believable by a jury if more than one alibi witness is presented who can account for the petitioner's whereabouts at or about the time of the crime." Id. He stated that trial counsel's "failure to call any additional alibi witnesses weakened the petitioner's closely related defense that he was not even present at the time of the shooting and therefore could not have been one of the perpetrators." Id. Judge Prescott concluded that "counsel's deficiencies, considered in the aggregate, demonstrate[d] prejudice warranting a new trial . . . ." Id., 96 (*Prescott*, *J.*, concurring in part and dissenting in part).

The petitioner filed a petition for certification to appeal with this court, which we granted. This appeal followed.

Grant *v.* Commissioner of Correction

## II

The petitioner claims that the Appellate Court erred in concluding that he failed to establish prejudice stemming from his trial counsel's failure to investigate the cell phone records of Douglas, a key state's witness. We agree.

The sixth amendment to the United States constitution guarantees a criminal defendant the right to the effective assistance of counsel.[4] See, e.g., *Strickland* v. *Washington*, supra, 466 U.S. 685–86. To prevail on a claim of ineffective assistance of counsel, a habeas petitioner must satisfy the two-pronged test set forth in *Strickland* v. *Washington*, supra, 687, by "demonstrating that (1) counsel's representation fell below an objective standard of reasonableness, and (2) counsel's deficient performance prejudiced the defense because there was a reasonable probability that the outcome of the proceedings would have been different had it not been for the deficient performance." (Internal quotation marks omitted.) *Thiersaint* v. *Commissioner of Correction*, 316 Conn. 89, 101, 111 A.3d 829 (2015).

In reviewing ineffective assistance of counsel claims, "we are mindful that [t]he habeas court is afforded broad discretion in making its factual findings, and those findings will not be disturbed unless they are clearly erroneous." (Internal quotation marks omitted.) *Johnson* v. *Commissioner of Correction*, 330 Conn. 520, 537, 198 A.3d 52 (2019). The ultimate question of whether a habeas petitioner's sixth amendment rights have been violated, however, "is a mixed determination of law and fact that requires the application of legal principles to the historical facts of [the] case." (Internal quotation marks omitted.) *Lapointe* v. *Commissioner of Correction*, 316 Conn. 225, 265, 112 A.3d 1 (2015). That determination

---

[4] The sixth amendment right to the effective assistance of counsel is made applicable to the states through the due process clause of the fourteenth amendment to the United States constitution. See, e.g., *Garner* v. *Commissioner of Correction*, 330 Conn. 486, 499 and n.9, 196 A.3d 1138 (2018).

354 Conn. 30        JANUARY, 2026        41

Grant *v.* Commissioner of Correction

is subject to this court's plenary review. E.g., *Moore* v. *Commissioner of Correction*, 338 Conn. 330, 338–39, 258 A.3d 40 (2021).

In the present appeal, the respondent, the Commissioner of Correction, does not challenge the Appellate Court's conclusion that the petitioner's trial counsel had performed deficiently by failing to investigate Douglas' phone records. He instead challenges only the claim that the petitioner was prejudiced by counsel's deficient performance, arguing that the petitioner has failed to make that showing and that the Appellate Court's judgment should be affirmed on that basis. Our inquiry, therefore, is limited to whether the Appellate Court majority correctly concluded that the petitioner had failed to establish prejudice stemming from his trial counsel's failure to investigate Douglas' cell phone records from the night of the shooting.

When defense counsel's performance is deficient, a new trial is required if the petitioner can demonstrate prejudice—that is, "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland* v. *Washington*, supra, 466 U.S. 694. The principal question, in other words, "is whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt." Id., 695. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id., 694. In making a prejudice determination, habeas courts "must consider the totality of the evidence before the judge or jury." Id., 695. Some factual findings will be "unaffected by the errors, and factual findings that were affected will have been affected in different ways." Id. Indeed, "[s]ome errors will have had a pervasive effect on the inferences to be drawn from the evidence, altering the entire evidentiary picture," whereas "some will have had an isolated, trivial effect."

Grant *v*. Commissioner of Correction

Id., 695–96. "[A] verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support." Id., 696. A court's "ultimate focus of inquiry must be on the fundamental fairness of the proceeding whose result is being challenged." Id.

At the petitioner's criminal trial, the state's case rested on two pillars: (1) the victim's eyewitness identification of the petitioner, and (2) Douglas' account of the events leading up to and following the shooting. As to the victim's identification of the petitioner, the victim testified that, a couple of months after the shooting, detectives presented her with a photographic array and that she "[i]mmediately" recognized the person who shot her. She stated that she proceeded at that time to circle the person in the array whom she had identified as her shooter. That photographic array was admitted into evidence, and the victim identified the petitioner when asked by the prosecutor at trial whether the person she identified in the photographic array was in the courtroom.

As to Douglas, his testimony was indisputably central to the state's case. He supplied the narrative of events leading up to and following the crimes, and his testimony formed the sole basis for the state's theory of conspiracy.[5] According to Douglas, the petitioner and Newkirk were in the back hallway of his apartment discussing their need for money when the two decided to call various pizza restaurants and a taxi company to determine which drivers might be carrying cash that they could take in a potential robbery. Douglas testified numerous times that the petitioner took Douglas' phone for that purpose and used it to place the calls to various businesses, including the call to Pizza 101, which ultimately brought the victim to Mary Shepard Place. Douglas further stated that, before the victim arrived, the victim called his phone, but he did not answer because he "[didn't] want

---

[5] The prosecutor did not call Newkirk or Anderson to testify at the petitioner's criminal trial.

Grant *v.* Commissioner of Correction

nothin' to do with it."[6] Although Douglas claimed that the petitioner had taken possession of Douglas' phone to make various calls, his testimony indicated that Douglas himself was apparently in possession of the phone when the victim called his number.

Douglas testified that, after ordering the pizza, the petitioner and Newkirk went outside, and Douglas heard a "big boom . . . ." Although Douglas stated that he did not go outside himself or otherwise see what occurred, he also told the jury that he saw "powder and smoke everywhere" and that "it was smoky in the backyard." Douglas testified that, when the petitioner and Newkirk returned inside, they appeared "nervous," but he did not ask them what had happened. Douglas stated that they all watched television for a while and that he eventually went upstairs to be with his son and girlfriend. He purportedly did not know when the petitioner and Newkirk left his apartment.

Although the respondent describes the state's underlying case against the petitioner as strong, the record is plain that both pillars of the state's case were subject to serious challenge. The victim's identification involved an identification of a stranger, viewed briefly, through a car window, late at night, in questionable lighting, and under stressful circumstances. Moreover, in the photographic array shown to the victim more than two months after the shooting, the petitioner (and no other person) was depicted wearing a hooded sweatshirt, the same type of clothing the shooter was reported wearing on the night in question, which risked making the petitioner stand out from the other individuals in the array. Douglas' photo was also never included in any

---

[6] At the petitioner's criminal trial, however, the victim testified that she called the number associated with Douglas' cell phone, which was printed on the pizza order slip, to have that person guide her to where she should deliver the pizza. She testified that a person with a "guy's voice" answered the phone and told her "where to drive to and . . . where to stop." Specifically, she testified that the person told her to go to 502 Mary Shepard Place.

Grant *v.* Commissioner of Correction

of the photographic arrays shown to the victim. These facts were brought out at the petitioner's criminal trial.[7]

The probative value of Douglas' testimony was subject to challenge because he minimized his own involvement in the criminal activity while shifting blame to the petitioner and Newkirk. He admitted to being present during key conversations and events in his apartment leading up to the attempted robbery and assault but then insisted that he had no part in planning or otherwise carrying out the crimes. He acknowledged hearing a "big boom" and seeing "powder and smoke everywhere," but he also said that he did not go outside and asked no questions of the petitioner and Newkirk when they returned to his apartment. In short, Douglas was less than a compelling witness. The prosecutor acknowledged that there was a "middle road" with Douglas. He asked the jurors directly, "how did you feel when [Douglas] said they took the phone, they said they needed money, looked to call several restaurants, looked to call a taxi company, and again those numbers were confirmed by the phone records, but I didn't want anything to do with it." The prosecutor acknowledged that "[e]veryone knows" that Douglas "obviously has some dirty hands" but urged the jurors to believe Douglas with respect to his account of the petitioner's and Newkirk's involvement in the crimes, arguing that his testimony aligned in many respects with the victim's, who had no apparent motive to lie.

At the petitioner's habeas trial, as we explained, the petitioner's habeas counsel introduced Douglas' phone records and the testimony and investigation report of Udvardy, a licensed private investigator, which called into question Douglas' account of what had happened. Specifically, Udvardy testified that, between 10 p.m. on April 30, 2011, and midnight on May 1, 2011, Douglas' phone records show that his phone was used to make only "mobile to mobile" phone calls, meaning that his cell phone was used to make calls only "from one cell phone to

---

[7] The petitioner filed a motion to suppress the victim's identification before trial, but the trial court denied it.

354 Conn. 30 JANUARY, 2026 45

Grant *v.* Commissioner of Correction

another." Udvardy testified that Douglas' phone was not used to make any phone calls to the phone number associated with Pizza 101 or to any other number "associated with any business establishments."[8] Udvardy also noted that there was a gap in the usage on Douglas' cell phone from 12:02 to 12:15 a.m. on May 1 (around the time of the crimes), which Udvardy explained meant that there were "no outgoing calls or texts from the phone . . . ."

In the present case, we acknowledge that whether the petitioner has established prejudice is a close question. On the basis of our careful review of all of the evidence, however, we are persuaded that he has—that is, that there is a reasonable probability that, but for trial counsel's failure to undertake a reasonable investigation into Douglas' phone records that were made available to her in discovery and to offer some or all of the records as evidence at trial, the jury would have had a reasonable doubt respecting the petitioner's guilt. Douglas' testimony that the petitioner used his cell phone to place the pizza order was not, as the respondent suggests, a peripheral or incidental detail; it was a central factual link in the state's theory connecting the petitioner to the victim. Had the phone records been admitted into evidence, the jury would have learned that Douglas' phone was not used on the night in question either to call or to case potential robbery victims or to call the pizza restaurant that employed the victim. This objective documentary evidence would have significantly discredited Douglas' account of what had transpired and, in turn, the credibility of a key state's witness. The jury could then have considered this discredited testimony in light of the court's instruction that, "[i]f you think that a witness has deliberately testified falsely in some respect, you

_____

[8] Although Udvardy testified that Pizza 101 was no longer in business, he explained that he located a phone number previously listed for the restaurant and that this same number appeared repeatedly in the cell phone records of the victim, who was employed by the restaurant.

Grant *v.* Commissioner of Correction

should carefully consider whether you should rely upon any of that witness' testimony."

The damage to Douglas' credibility is not the only impact that the cell phone records would have had on the evidentiary picture before the jury and the overall strength of the state's case. As Judge Prescott aptly noted in his concurring and dissenting opinion, "[t]he phone records also show a gap in the use of Douglas' phone during the time of the assault, which, if the jury did not believe that Douglas had given the phone to the petitioner, supports a reasonable inference that Douglas was one of the assailants and had stopped using the phone during that period of time." *Grant* v. *Commissioner of Correction*, supra, 225 Conn. App. 101 (*Prescott, J.*, concurring in part and dissenting in part). On that point, the petitioner's expert witness, Carlow, testified that competent trial counsel would have pointed out this gap of inactivity to the jury. Carlow remarked that there were two answers to the gap: either Douglas coincidentally was not making any phone calls or sending text messages during that time period, or it "could be he's not making any phone calls because [he's] standing outside the car with a gun in his hand attempting to rob [the victim] and then shoots her as she leaves." Presenting the cell phone records to the jury and underscoring those points would have supported the petitioner's third-party culpability defense and created reasonable doubt in the minds of the jurors as to the petitioner's guilt, especially in light of the weaknesses associated with the victim's identification of the petitioner and Douglas' testimony, as described previously.

Finally, the cell phone records would have undermined the corroborating testimony of Siemionko, who testified that Douglas' cell phone was used to call Pizza 101 on the night in question. Demonstrating that no such call (or any calls to other businesses) was made from Douglas' phone would have revealed that nothing in the record corroborated Douglas' account of events, contradicted

Grant *v*. Commissioner of Correction

testimony from a law enforcement officer, and further weakened the state's case.

The respondent argues that the petitioner has failed to establish prejudice for three reasons. First, he contends that prejudice cannot be adequately assessed in the present case due to the petitioner's failure to call Douglas and Siemionko to testify at the habeas trial. Second, he argues that the evidence the petitioner produced at his habeas trial does not prove that calls were not placed from Douglas' phone to any businesses, including Pizza 101. Third, he claims that Douglas' cell phone records do not undermine Douglas' account on matters of significance.

As to the respondent's first argument, he cites to *Bowens* v. *Commissioner of Correction*, 333 Conn. 502, 538, 217 A.3d 609 (2019), in support of his contention that, in the absence of Douglas' and Sieminoko's testimony, there is no basis on which to determine how those witnesses would have responded if they had been confronted with the cell phone records. He argues that "[w]itnesses confronted with evidence seemingly inconsistent with their testimony often explain the gap, rephrase testimony to account for the information, or admit mistakes with credible explanations."

This argument misapprehends the petitioner's claim. The petitioner does not contend that Douglas or Siemionko would have been presented with the cell phone records in some particular manner or that they would have responded in a specific way had they been confronted with the records at the criminal trial. Rather, his argument is that, had trial counsel fulfilled her duty to investigate Douglas' version of events and to present the cell phone records during the defense's case, this objective evidence would have significantly undermined the credibility and probative value of the testimony on which the state's theory rested. The relevant question is not how Douglas or Siemionko might have explained or rationalized the discrepancies if confronted with the records, but whether the records themselves would have provided the jury with a powerful basis to question the accuracy

Grant *v.* Commissioner of Correction

and reliability of their respective accounts given during their direct examinations. The phone records speak for themselves as to the critical fact at issue, namely, that Douglas' cell phone was not used on the night in question in the manner he claimed. In light of the detailed and unequivocal nature of Douglas' trial testimony on this precise issue, we are not persuaded that the strength of the state's case could have been rehabilitated if Douglas had been given the opportunity to explain away that testimony. Likewise, the phone records also establish that Siemionko's testimony that Douglas' phone was used to call Pizza 101 prior to the pizza delivery was not accurate. It makes no difference for present purposes whether the inaccuracy was the result of innocent mistake, linguistic imprecision, or something else. What matters is that the testimony was neither accurate nor reliable. In summary, the objective facts reflected in the cell phone records would have permitted the jury to doubt the narratives offered by both Douglas and Siemionko and to question their credibility, regardless of any post hoc explanations they might have offered if recalled in the state's rebuttal case.

The cell phone records also reveal a distinct gap in Douglas' cell phone activity at crucial times. This neutral evidence—independent of any witness testimony—would have provided the jury with an additional, objective basis on which to assess whether the petitioner committed the crimes, or whether, consistent with the defense's theory of third-party culpability, Douglas was responsible.

*Bowens* does not compel a different conclusion. In that case, the court addressed a claim of prejudice premised on trial counsel's failure to impeach a state's witness with a prior inconsistent statement that she had made—evidence whose impact depended on how the witness would have responded when confronted with it. See *Bowens* v. *Commissioner of Correction*, supra, 333 Conn. 538 ("[w]ithout knowing how [the witness] would have explained and reconciled her allegedly inconsistent statements . . . it is impossible to know how the jury

354 Conn. 30 JANUARY, 2026 49

Grant *v.* Commissioner of Correction

would have weighed them at the petitioner's criminal trial").[9] Here, by contrast, the cell phone records do not constitute a prior inconsistent statement but, rather, independent and objective documentary evidence that flatly contradicts and calls into question the credibility of a key state's witness and a law enforcement officer. The records also show a gap in cell phone activity that does not hinge on any subjective explanation of a witness. For these reasons, the absence of these witnesses from the habeas proceeding does not preclude a meaningful assessment of prejudice.

The respondent's second argument seeks to discredit the evidence that the petitioner presented at his habeas trial. He contends that, although Udvardy determined that the outgoing calls were to cell phone numbers, Udvardy could not definitively determine whether these cell phone numbers were used by businesses, including Pizza 101. This argument unfairly characterizes the evidence that the petitioner presented to the habeas court. Neither Udvardy's report regarding his investigation of Douglas' cell phone records nor his testimony equivocated about the fact that the records associated with Douglas' cell phone number revealed that the phone was not used to call Pizza 101. Udvardy found and identified the number for Pizza 101 based on a publicly available source, which listed that specific number for the business. The same number also appeared in cell phone records of the victim, who was employed by Pizza 101, which confirms that the number Udvardy identified was, in fact, used by Pizza 101 to receive calls. Although the respondent now attempts to cast doubt on the petitioner's evidence,

_____

[9] Although, in *Bowens*, this court took exception to the petitioner's failure to present the witness at the habeas trial, it nonetheless proceeded to analyze prejudice based on the specific facts of that case, concluding that the petitioner had failed to make that showing. See *Bowens* v. *Commissioner of Correction*, supra, 333 Conn. 539 ("[T]here is no reason to think that the jury would have viewed [the witness'] inability to recall meeting the petitioner as overly damaging to his alibi defense. We thus conclude that, even if [trial counsel's] representation of the petitioner was deficient, the petitioner has failed to establish that he was prejudiced thereby.").

Grant *v.* Commissioner of Correction

he offered no evidence at the habeas trial suggesting that Pizza 101 used a different number, relied on a cell phone line not publicly listed, or routed delivery orders through unidentified personal cell phones.

Finally, the respondent downplays the import of Douglas' cell phone records, arguing that they do not undermine Douglas' account on matters of significance. For the reasons we have already detailed in this opinion, we disagree with that contention. In our view, had the petitioner's trial counsel reviewed the phone records made available to her during discovery and had the jury been presented with this neutral and objective evidence—particularly in light of the already compromised nature of Douglas' testimony and the weaknesses in the victim's identification of the petitioner—there is a reasonable probability that the outcome of the petitioner's criminal trial would have been different.

### III

For the foregoing reasons, we conclude that the petitioner has established that he was prejudiced by his trial counsel's deficient performance stemming from her failure to investigate and present the phone records of Douglas. Because he has made that showing, he is entitled to a new trial.[10]

The judgment of the Appellate Court is reversed and the case is remanded to that court with direction to reverse the judgment of the habeas court and to remand the case to that court with direction to grant the petitioner's amended petition for a writ of habeas corpus, to vacate the petitioner's conviction on all charges, and to order a new trial.

In this opinion the other justices concurred.

---

[10] Because the petitioner successfully established his claim of ineffective assistance of counsel stemming from his trial counsel's failure to investigate and present Douglas' phone records, it is unnecessary for us to address the second and third certified questions.