******************************************

The "officially released" date that appears near the beginning of an opinion is the date the opinion will be published in the Connecticut Law Journal or the date it is released as a slip opinion. The operative date for the beginning of all time periods for the filing of postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying an opinion that appear in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced or distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************

JAMES HILTON *v*. COMMISSIONER
OF CORRECTION
(SC 21106)

Mullins, C. J., and McDonald, D'Auria,
Ecker, Dannehy and Bright, Js.

*Syllabus*

The petitioner, who had been convicted of murder, among other crimes, in connection with the shooting death of the victim, filed a second petition for a writ of habeas corpus, claiming that his trial counsel and first habeas counsel had rendered ineffective assistance by failing to adequately investigate the opinion of K, the associate medical examiner who had performed the victim's autopsy. At the petitioner's criminal trial, a key issue was whether the fatal shot that caused the victim's death had been discharged at close range or from a distance, and K opined during the criminal trial that the barrel of the gun that was used to shoot the victim had been touching the victim's skin when the gun was fired. At the petitioner's first habeas trial, his counsel presented the expert testimony of C, the chief medical examiner, and D, a forensic scientist, in support of the petitioner's claim that trial counsel had failed to adequately cross-examine K and to present expert testimony on the petitioner's behalf. The first habeas court rejected the petitioner's claim and denied the first habeas petition. At his second habeas trial, the petitioner presented the testimony of W, an expert in forensic pathology, who disagreed with K's conclusion that the victim's fatal wound was a contact wound and testified that the victim had been shot from a distance. The second habeas court, after reviewing the prior testimony of K, C and D, and weighing W's testimony, found that neither W nor his conclusion about the shot distance was credible and rendered judgment denying the second habeas petition. The petitioner, on the partial granting of certification, appealed to the Appellate Court, which dismissed in part the petitioner's appeal and affirmed the second habeas court's judgment. In so doing, the Appellate Court rejected the petitioner's claim that the second habeas court had failed to apply the proper standard for evaluating the credibility of expert witnesses, purportedly set forth in *Lapointe* v. *Commissioner of Correction* (316 Conn. 225). On the granting of certification, the petitioner appealed to this court. *Held*:

The Appellate Court correctly determined that the second habeas court had applied the correct legal standard for evaluating the credibility of expert witnesses, this court having concluded that *Lapointe* did not vary the standard, set forth in *Strickland* v. *Washington* (466 U.S. 668), that is applicable to ineffective assistance claims or alter how a habeas court is to assess the credibility of experts.

*Lapointe* did not prescribe a different legal standard for a habeas court's assessment of the credibility of expert witnesses; rather, *Lapointe* involved an unusual circumstance in which the habeas court made clearly erroneous credibility findings that the record did not support, and the prejudicial effect of that error was evident in *Lapointe* because the evidence against the petitioner in that case was weak.

In the present case, the second habeas court was required to make a predictive assessment about whether there was a reasonable probability that the petitioner would have prevailed if his first habeas counsel had called W to testify, and, in making that predictive assessment, the second habeas court properly weighed W's expert opinion in light of W's methodology and the court's own firsthand observations of the persuasiveness of W's testimony.

Accordingly, the second habeas court applied the proper legal standard when it concluded that the outcome of the petitioner's criminal trial would not have been different if W had testified because W's testimony would not have persuaded the criminal trial jury insofar as W failed to account for certain other features of the fatal wound about which C and D had testified, and W's testimony would not have overcome the state's overwhelming eyewitness and forensic testimony, as well as evidence of the petitioner's motive.

Moreover, this court agreed with the Appellate Court that the evidence of the petitioner's guilt in this case was not weak insofar as there were two eyewitnesses who gave statements identifying the petitioner as the shooter and no witnesses who corroborated the petitioner's claim that other individuals were responsible for the shooting, and the Appellate Court had previously noted the overwhelming nature of the state's case against the petitioner, both in the petitioner's direct appeal and also in his appeal from the first habeas court's judgment.

Argued March 6—officially released June 30, 2026

*Procedural History*

Amended petition for a writ of habeas corpus, brought to the Superior Court in the judicial district of Tolland and tried to the court, *Klatt, J.*; judgment denying the petition, from which the petitioner, on the granting of partial certification, appealed to the Appellate Court, *Alvord, Moll* and *Clark, Js.*, which dismissed the appeal in part and affirmed the habeas court's judgment, and the petitioner, on the granting of certification, appealed to this court. *Affirmed.*

*Alexander T. Taubes*, for the appellant (petitioner).

*Laurie N. Feldman*, assistant state's attorney, with whom, on the brief, were *John P. Doyle, Jr.*, state's attorney, and *Craig P. Nowak*, supervisory assistant state's attorney, for the appellee (respondent).

*Robert J. Meredith, Desmond Ryan* and *M. Chris Fabricant*, pro hac vice, filed a brief for the Innocence Project, Inc., et al. as amici curiae.

*Opinion*

D'AURIA, J. In this certified appeal, we consider whether the Appellate Court correctly determined that the habeas court had applied the correct legal standard in denying the second petition for a writ of habeas corpus filed by the petitioner, James Hilton. The petitioner claims that the habeas court failed to apply the standard for evaluating the credibility of expert witnesses that this court articulated in *Lapointe* v. *Commissioner of Correction*, 316 Conn. 225, 112 A.3d 1 (2015). We disagree and affirm the Appellate Court's judgment.

The Appellate Court's opinion aptly recites the facts and procedural history required to resolve this appeal; see *Hilton* v. *Commissioner of Correction*, 225 Conn. App. 309, 312–23, 315 A.3d 1135 (2024); which we summarize along with other undisputed facts in the record. In July, 2000, the victim, William Rodriguez, was shot and killed on Truman Street in New Haven. The police found the victim's body on the sidewalk, surrounded by a crowd of people. An autopsy later revealed that the victim died from a single gunshot at close range to the left side of his head.

A drug turf war in the Truman Street area between the petitioner and the victim's associates had been ongoing, including two altercations in the days leading up to the shooting. The victim had recently moved into an apartment on Truman Street. One eyewitness to the shooting, Sherice Mills, saw the petitioner approach the victim as the victim was making a drug sale to someone in a car. Mills testified that she had heard the petitioner state that he was "about to kill [the victim]" and observed the petitioner shoot the victim in the head. (Internal quotation marks omitted.) Id., 313. According to Mills, the petitioner fell to the ground with the victim, and the petitioner "kept holding [the victim's] head, saying he didn't mean to do it and [telling] somebody to call the police." (Internal quotation marks omitted.) Id. Mills later identified the petitioner as the shooter from an array of photographs. A second eyewitness, Simone Williams,

corroborated Mills' account and added that the petitioner had approached the victim from behind and stated: "You ain't from around here, son," and, "[y]ou need to move from around here, son," and then took a gun from behind his back and shot the victim. (Internal quotation marks omitted.) Id., 314. Williams positively identified the petitioner in a photographic array and did so again at trial. A third eyewitness, Toisann Henderson, saw the petitioner shoot the victim and ran into the victim's apartment to tell the victim's girlfriend, Cora Moore.

The petitioner voluntarily went to the police station and informed detectives that he had been sitting on his porch when he heard a commotion and went to see what was happening. He said that a third man had drawn a gun, that the petitioner had grappled for the gun, and "it went bashing across [the victim's] head." (Internal quotation marks omitted.) Id., 315. At trial, the petitioner described how several seconds after he had fought with the third man, a fourth man shot the victim and ran away. The petitioner testified that, immediately after the gunshot, he applied pressure to the victim's wound to stop the bleeding and then left to make sure someone had called an ambulance. He explained that he left the scene after people in the crowd began to tell the police that he was the shooter. Although the petitioner had his bloodied clothes washed, the state discovered a drop of blood on his boxer shorts that matched the victim's blood type and DNA.

The state charged the petitioner with murder, criminal possession of a pistol or revolver and carrying a pistol or revolver without a permit. One of the key issues at the petitioner's criminal trial was the distance the fatal gunshot had traveled. The state contended that the petitioner had shot the victim at close range; the petitioner maintained that someone else had fired the gunshot from a distance. The state presented the testimony of Arkady Katsnelson, an associate medical examiner in the Office of the Chief Medical Examiner, who performed the victim's autopsy. Katsnelson testified that, because "there was

no evidence of soot or gunpowder," the victim's gunshot wound case resembled either a "long distance" wound resulting from a gun generally being "more than three feet" away, or a contact wound caused by "the barrel of the gun . . . touching the skin, touching the body . . . ." (Internal quotation marks omitted.) Id., 316 and n.2. Katsnelson's expert opinion was that "[t]his gunshot wound, it is not typical [of] a gunshot wound which was created from a long distance because a gunshot wound from a distance will be a round shape, and the round shape . . . and . . . size of the wound will be slightly bigger than the size of the bullet." (Internal quotation marks omitted.) Id., 316. Katsnelson noted that a contact wound is larger and does not have gunpowder residue around the wound because the gun's muzzle directs gases and residue through the skin. Katsnelson's conclusion was that the victim's wound was consistent with a contact gunshot wound of entrance, meaning the barrel of the gun was touching the skin when the gun was discharged. The petitioner's defense counsel cross-examined Katsnelson but did not present his own expert on the nature of the victim's wound to counter Katsnelson's opinion.

A jury found the petitioner guilty of murder, criminal possession of a pistol or revolver and carrying a pistol or revolver without a permit. The trial court imposed a total effective sentence of sixty-five years of imprisonment. The Appellate Court rejected the petitioner's prosecutorial impropriety claim and affirmed the petitioner's conviction on direct appeal. See *State* v. *Hilton*, 79 Conn. App. 155, 170, 829 A.2d 890 (2003).

The petitioner commenced his first habeas action, in which he alleged that his criminal trial counsel had rendered ineffective assistance by failing to adequately cross-examine Katsnelson regarding the nature of the victim's fatal wound and failing to present his own expert testimony regarding the wound. At the first habeas trial, the petitioner's counsel sought to undercut Katsnelson's autopsy report and conclusions by presenting the expert testimony of Harold Wayne Carver II, the state's chief

medical examiner, and Peter DeForest, who held a doctorate degree in forensic science.

Carver testified that there was a sufficient basis from the autopsy photographs and report to conclude that the wound had resulted from a contact shot based on the large size and abnormal shape of the wound. He noted that one phenomenon that is a "very, very strong criteri[on]" of a contact wound is a blowback laceration that occurs when the force is great enough to make the skin explode toward the muzzle. He explained that blowback lacerations can have serrated edges, also referred to as "stellate" because they are starlike, which can extend symmetrically in all directions around the wound. Carver also opined that, in addition to the large size and irregular shape of the wound, there was one stellate arm present at the irregular perforation, indicating a blowback laceration caused by a contact wound.

DeForest testified that the wound was "ambiguous," and he could not conclude with certainty whether the wound resulted from a contact shot or from a shot from a distance. DeForest noted that the oval shape of the wound could have been caused by a destabilized bullet that struck the skin sideways. "Nevertheless, [DeForest] acknowledged that a bullet striking the skin at an angle can cause an oval wound. . . . In [DeForest's] assessment, this was either a contact wound or a distance wound where the bullet had become destabilized." (Citation omitted.)

The habeas court denied the petitioner's first habeas petition. The court determined that defense counsel had not rendered deficient performance because the scope of the cross-examination of Katsnelson reflected a reasonable trial strategy. The habeas court also concluded that the petitioner had failed to prove prejudice because DeForest's opinion that the wound was ambiguous did not contradict Katsnelson's testimony that it was a contact wound. The Appellate Court affirmed the habeas court's judgment; *Hilton* v. *Commissioner of Correction*, 161 Conn. App. 58, 85, 127 A.3d 1011 (2015); and we denied

the petitioner's petition for certification to appeal. *Hilton* v. *Commissioner of Correction*, 320 Conn. 921, 132 A.3d 1095 (2016).

The petitioner then filed his second habeas petition, which is at issue in this appeal. He alleged that his first habeas counsel and criminal trial counsel had rendered ineffective assistance by failing to adequately investigate Katsnelson's opinion. He further alleged that, although his first habeas counsel had presented two experts (DeForest and Carver), both counsel failed to present expert testimony from a forensic pathologist to undercut Katsnelson's opinion. *Hilton* v. *Commissioner of Correction*, supra, 225 Conn. App. 320–21. In support of this claim, the petitioner presented the testimony and report of his new forensic pathology expert, Cyril H. Wecht.

Wecht testified that he had reviewed, among other things, Katsnelson's autopsy report and photographs, Katsnelson's testimony from the criminal trial, a police report, the petitioner's posttrial brief from his first habeas trial, and a field report from a private investigation service. Wecht acknowledged that he had not reviewed the transcripts from the first habeas trial, including the testimony of Carver that the wound had blowback stellate. Wecht disagreed with Katsnelson's opinion and offered his own opinion that the victim's gunshot wound was not a contact wound but, instead, resulted from a bullet fired from a gun held at least twenty-four inches from the victim. He explained that he arrived at his conclusion because there was no gunpowder residue or stippling, which is the term used to describe skin abrasions resulting from burning gunpowder particles. Wecht agreed that the wound was oval and not round, indicated that he did not see any stellate tears on the wound, and could rule out a "loose" contact gunshot wound in which gunpowder residue goes into the wound or onto bone, but also onto skin.

The habeas court denied the petitioner's second habeas petition. The court reviewed in detail the prior testimony

of Katsnelson, DeForest, and Carver with respect to the distance a gun would have had to be from the victim to create the type of wound that the victim sustained. The court observed that "[t]hree of the four experts found that there were indicia of a contact wound. Only . . . Wecht completely ruled out the possibility of a contact wound." The court went on to state that it did "not find . . . Wecht's assessment to be credible, especially because he did not review . . . Carver's testimony from the first habeas trial. . . . Carver observed a stellate tear and evidence of a blowback laceration. Additionally . . . Wecht did not provide any explanation for the causes of the oval wound. Nor did . . . Wecht's evaluation address the potential effects of the victim being kept alive for a day or more so that organs could be harvested from his cleaned and disinfected body, the blood from the wound washing away gunshot residue, or the beginnings of the healing process making residue in the wound difficult to detect. The more credible evidence establishes that the shot that killed the victim was a contact shot. Because the court does not find . . . Wecht's conclusion that the shot could not have been fired from less than twenty-four inches to be credible, [the petitioner's] claims premised thereon must fail."

The habeas court concluded that the petitioner's trial counsel did not perform deficiently by failing to adequately cross-examine Katsnelson and that first habeas counsel did not perform deficiently by calling Carver, a forensic pathologist, "whose experience and credentials are on par with, if not superior, to [Wecht]." The habeas court further found that the petitioner had failed to establish prejudice because the court was not persuaded that Wecht's testimony would have made a difference in the outcome of the petitioner's criminal trial because Wecht was not credible, and the state had abundant and overwhelming evidence of identification and motive, which supported the forensic testimony at the petitioner's criminal trial.

The petitioner filed a petition for certification to appeal with the habeas court. Two of the grounds he advanced

challenged whether the habeas court had failed to apply the correct legal standard under *Lapointe* v. *Commissioner of Correction*, supra, 316 Conn. 272–73, to determine that Wecht's conclusion was not credible. The habeas court denied the petition to appeal as to this issue, holding that, "[c]ontrary to the petitioner's argument in the petition for certification to appeal, *Lapointe* . . . does not preclude a habeas court from determining that an expert witness and their conclusion are not credible. Nor does *Lapointe* establish a standard that a petitioner is entitled to a new trial by presenting an expert who is of 'sufficient import and credibility.' Such a vague standard could necessitate a new criminal trial in nearly all postconviction habeas proceedings involving expert witnesses. A habeas court's credibility assessments and how they impact the prejudice prong of the ineffective assistance of counsel standard would be rendered meaningless if a habeas court had to grant a new trial upon the presentation of expert testimony that was 'of sufficient import and credibility.' " The habeas court further elaborated on its finding about Wecht's credibility, stating that it found "Wecht's conclusion that the shot could not have been fired from less than twenty-four inches to be not credible. The court did not find . . . Wecht credible based on the totality of all evidence from the criminal, prior habeas, and current habeas trials. . . . Wecht did not review all relevant evidence, and his opinion was contradicted by the factual findings regarding the shape of the wound, stellate tearing, and evidence of a blowback laceration. It is this lack of foundation supporting . . . Wecht's conclusion about the shot distance that caused the court to find him not credible as an expert witness." (Emphasis omitted.)

The Appellate Court affirmed the habeas court's judgment. See *Hilton* v. *Commissioner of Correction*, supra, 225 Conn. App. 341. In particular, it rejected the petitioner's claim that the habeas court had applied an incorrect legal standard in assessing witness credibility by failing to follow the prescriptions of *Lapointe*. See id., 333. It held that the habeas court had applied the

correct, well established standard because *Lapointe* was factually and legally distinguishable. See id., 337–38. Factually, the court held that the evidence of the petitioner's guilt was overwhelming in the present case, whereas the evidence against the petitioner in *Lapointe* was weak and founded on "highly questionable admissions." (Internal quotation marks omitted.) Id., 337. The Appellate Court further held that *Lapointe* involved a *Brady*[1] claim, whereas the petitioner in the present case based his claim on *Strickland*.[2] See id., 331, 337–40. We granted certification to decide whether "the Appellate Court correctly conclude[d] that the habeas court had properly declined to apply the standard in *Lapointe* . . . for evaluating an expert witness' credibility . . . ." (Citation omitted.) *Hilton* v. *Commissioner of Correction*, 351 Conn. 916, 332 A.3d 293 (2025).

"A defendant seeking habeas relief for ineffective representation must prove two elements. First, the defendant must show that counsel's performance was deficient. This requires [a] showing that counsel made errors so serious that counsel was not functioning as the counsel guaranteed the defendant by the [s]ixth [a]mendment. Second, the defendant must show that the deficient performance prejudiced the defense." (Internal quotation marks omitted.) *Maia* v. *Commissioner of Correction*, 347 Conn. 449, 460, 298 A.3d 588 (2023). To prevail on a second habeas petition, a petitioner is faced with the task of establishing that (1) his first habeas counsel was ineffective, and (2) his trial counsel was ineffective. See, e.g., *Kaddah* v. *Commissioner of Correction*, 324 Conn. 548, 562, 153 A.3d 1233 (2017).

In determining whether a petitioner has met his burden of establishing prejudice, "[t]he principal question . . . is whether there is a reasonable probability that, absent the errors, the [fact finder] would have had a reasonable doubt respecting guilt. . . . A reasonable probability

---

[1] *Brady* v. *Maryland*, 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963).

[2] *Strickland* v. *Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984).

is a probability sufficient to undermine confidence in the outcome. . . . In making a prejudice determination, habeas courts must consider the totality of the evidence before the judge or jury. . . . Some factual findings will be unaffected by the errors, and factual findings that were affected will have been affected in different ways. . . . Indeed, [s]ome errors will have had a pervasive effect on the inferences to be drawn from the evidence, altering the entire evidentiary picture, whereas some will have had an isolated, trivial effect. . . . [A] verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support." (Citations omitted; internal quotation marks omitted.) *Grant* v. *Commissioner of Correction*, 354 Conn. 30, 41–42, 348 A.3d 463 (2026).

In assessing whether a petitioner has met his burden, a habeas court, as the finder of fact, must assess whether to believe all, none, or some of the testimony presented. See, e.g., *Barlow* v. *Commissioner of Correction*, 343 Conn. 347, 367, 273 A.3d 680 (2022). The habeas court "is free to juxtapose conflicting versions of events and determine which is more credible." (Internal quotation marks omitted.) *Echeverria* v. *Commissioner of Correction*, 193 Conn. App. 1, 15 n.6, 218 A.3d 1116, cert. denied, 333 Conn. 947, 219 A.3d 376 (2019); see also *Bowens* v. *Commissioner of Correction*, 333 Conn. 502, 523, 217 A.3d 609 (2019).

An appellate court "does not retry the case or evaluate the credibility of the witnesses. . . . Rather, [the reviewing court] must defer to the [habeas court's] assessment of the credibility of the witnesses based on its firsthand observation of their conduct, demeanor and attitude." (Internal quotation marks omitted.) *Taylor* v. *Commissioner of Correction*, 324 Conn. 631, 643, 153 A.3d 1264 (2017); accord *Sanchez* v. *Commissioner of Correction*, 314 Conn. 585, 604, 103 A.3d 954 (2014). A habeas court's pure credibility determination is unassailable, and we will not disturb it on appeal. See *Breton* v. *Commissioner of Correction*, 325 Conn. 640, 694, 159 A.3d

1112 (2017); *Orcutt* v. *Commissioner of Correction*, 284 Conn. 724, 741, 937 A.2d 656 (2007). "Because it is the [habeas] court's function to weigh the evidence and determine credibility, we give great deference to its findings. . . . In reviewing factual findings, [w]e do not examine the record to determine whether the [court] could have reached a conclusion other than the one reached. . . . Instead, we make every reasonable presumption . . . in favor of the [habeas] court's ruling." (Internal quotation marks omitted.) *Barlow* v. *Commissioner of Correction*, supra, 343 Conn. 357–58. Thus, the habeas judge's credibility determinations and findings are entitled to deference from this court and cannot be disregarded unless they are clearly erroneous. See, e.g., *Small* v. *Commissioner of Correction*, 286 Conn. 707, 716, 946 A.2d 1203, cert. denied sub nom. *Small* v. *Lantz*, 555 U.S. 975, 129 S. Ct. 481, 172 L. Ed. 2d 336 (2008).

In *Lapointe*, this court recognized an "exceptional factual and procedural scenario" in which we held that the habeas court's credibility assessment of expert witnesses was clearly erroneous. *Lapointe* v. *Commissioner of Correction*, supra, 316 Conn. 272–73.[3] In that case, the petitioner was convicted of capital felony and other offenses for the rape and murder of an elderly woman and the arson of her apartment to destroy the evidence. Id., 229. After an unsuccessful direct appeal and first

---

[3]In the decade since *Lapointe,* this court has not encountered another factual and procedural scenario in which it was appropriate to review with elevated scrutiny a habeas court's credibility assessment of an expert. Instead, we have twice rejected the application of *Lapointe* review. See, e.g., *In re Jewelyette M.*, 351 Conn. 511, 562 n.32, 332 A.3d 207 (2025) (trial court's finding of " '*no credible evidence*' " was not limited circumstance in which *Lapointe* applies (emphasis in original)); *State* v. *Campbell*, 328 Conn. 444, 486–88 and n.13, 180 A.3d 882 (2018) (trial court's discrediting of defendant's experts was not subject to *Lapointe* review). And we have relied on *Lapointe* for the established rule that this court must *defer* to a habeas court's credibility assessments. See, e.g., *Horn* v. *Commissioner of Correction*, 321 Conn. 767, 783 n.12, 138 A.3d 908 (2016) (quoting *Lapointe* for proposition that " 'we ordinarily accord deference to credibility determinations that are made on the basis of [the] firsthand observation of [a witness'] conduct, demeanor and attitude' ").

habeas petition, the petitioner filed a second habeas petition alleging that his first habeas counsel had rendered ineffective assistance by failing to pursue a claim that the state violated *Brady* by withholding a police note regarding the amount of time that the fire had burned inside the apartment before it was discovered. Id., 230–31. The petitioner claimed that the note would have established a complete alibi defense because it purported to identify the time frame within which the fire was set, for which the petitioner had witnesses testify that he was home. Id., 231. At the second habeas trial, the petitioner and the respondent presented conflicting expert testimony as to the length of time that the fire had burned in the victim's apartment. Id., 232–33. The habeas court denied the petitioner's claim because it found that the testimony of the respondent's expert was far more persuasive than the testimony of the petitioner's experts and that it was not reasonably probable that, if the jury at the petitioner's criminal trial had heard the testimony of the petitioner's experts, it would have credited that testimony and reached a different result. See id., 233.

This court in *Lapointe* did not substitute its own credibility determination for that of the habeas court but, instead, concluded that the underlying factual findings on which the habeas court relied to discredit the petitioner's experts were clearly erroneous because they were unsupported by the record. See id., 273. This court held that it was "not bound" by the habeas court's "appraisal of the scientific underpinnings of the parties' expert testimony"; id., 261; because the habeas court's "critique" of the petitioner's experts was "comprised of factually unfounded assertions." Id., 277. For instance, we reasoned that the habeas court had erroneously **(1)** characterized the testimony of the petitioner's experts as a "high energy fire" when they in fact did not state that and had opined that it was a "low energy fire"; id., 278; **(2)** stated that the respondent's expert provided a lower peak temperature when his testimony was the opposite; id.; **(3)** considered the petitioner's experts' maximum fire temperature as " 'wildly exaggerated' " when the

respondent's expert never disputed that testimony; id., 279; and (4) determined that the petitioner's experts' fire burn time was contradicted by the historical and physical evidence marshaled by the respondent's expert when a review of the criminal trial record showed the converse. Id., 287–88. In light of these clearly erroneous findings and taking "due account of the fact that the state's case against the petitioner was relatively weak, founded as it was on highly questionable admissions" by the petitioner; id., 261; whose cognitive and motor skills were impaired as a result of Dandy-Walker syndrome, causing him to be "slow-witted, easily confused, childlike and gullible"; id., 240; this court determined that the petitioner was entitled to a new criminal trial. Id., 349.

In the present case, the question the petitioner raised in his petitions for certification to the habeas court and this court, and the question as to which we granted certification, is whether the habeas court had erred by failing to apply *Lapointe* in assessing Wecht's credibility. The parties do not dispute that the habeas court did not cite, apply, or use a standard articulated by *Lapointe.* We conclude, however, that the habeas court did not err in not applying *Lapointe* because our decision in that case did not alter a habeas court's analysis of a claim brought pursuant to *Strickland* v. *Washington*, 466 U.S. 668, 687, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984), or how it is to make credibility assessments of experts. *Lapointe* represented an unusual circumstance in which this court concluded that the habeas court made erroneous credibility findings that the record did not support in a case in which the prejudicial effect of that error was evident because the evidence against the petitioner was weak. What made *Lapointe* "extraordinary" was the searching nature of the appellate review we found necessary to review for clear error a habeas court's credibility determination of an expert witness; our analysis did not change the legal standard the trial court must apply in making credibility determinations in the first instance. Because *Lapointe* in fact did not prescribe a different legal standard to be applied by the habeas court, the habeas court

in the present case did not err when it applied the usual standard set forth in *Strickland*.

Our well established standard—both before and after *Lapointe*—required the habeas court to make the predictive judgment as to whether there is a reasonable probability that the petitioner would have prevailed if the petitioner's first habeas counsel had called Wecht to testify. See, e.g., *Grant* v. *Commissioner of Correction*, supra, 354 Conn. 50. In making that predictive assessment, the habeas court was required to assess Wecht's expert opinion based on his methodology and its firsthand observation of the persuasiveness of his testimony. See, e.g., *Bowens* v. *Commissioner of Correction*, supra, 333 Conn. 523; *Taylor* v. *Commissioner of Correction*, supra, 324 Conn. 643–44. The habeas court properly applied this legal standard as it quoted the apt legal principles and expressly concluded that the outcome of the petitioner's criminal trial would not have been different if Wecht had testified for two principal reasons. First, the court found that Wecht's testimony would not have persuaded the jury because he failed to account for the shape and stellate tear around the wound, as well as the time that had elapsed between the shooting and autopsy. Second, the habeas court determined that Wecht's testimony would not have overcome the state's overwhelming eyewitness and forensic testimony, as well as evidence of the petitioner's motive, that bolstered its case.

The petitioner further asks this court to apply *Lapointe* on appeal to reverse the habeas court's determination that Wecht was not credible. This argument is outside the question on which the petitioner requested and we granted certification, and would necessitate *our* application of *Lapointe* instead of the habeas court's standard. See *State* v. *Armadore*, 338 Conn. 407, 438 n.15, 258 A.3d 601 (2021). We will not undertake the task at this point. Doing so would not benefit the petitioner in any event, because it is evident from the foregoing analysis that the petitioner in the present case, unlike in *Lapointe*, cannot demonstrate that the reasons the habeas court

discredited Wecht were factually unsupported. The record supports each of the habeas court's reasons for declining to credit Wecht's opinion, so this case does not present the same type of "limited" circumstance this court encountered in *Lapointe* that led us to reverse the habeas court's credibility finding in that case. *Lapointe* v. *Commissioner of Correction*, supra, 316 Conn. 306. Under these circumstances, we must defer to the habeas court's credibility determination.

We also agree with the Appellate Court that, unlike in *Lapointe*, the state's evidence of guilt in the present case was not weak. The habeas court aptly found that the state's case against the petitioner was "overwhelming" because "[t]here were multiple witnesses to the argument and ongoing feud between him and the victim. Identification was not an issue as all parties knew each other. There were two eyewitnesses who remained on the scene and gave statements to [the] police identifying [the petitioner] as the shooter and placing him standing right next to the victim when he was shot. There were no witnesses to [the petitioner's claimed] third and fourth individuals. . . . [T]he sole witness who testified in support of [the petitioner's] claim that someone else shot the victim was wrong about the time and location of the shooting and did not observe a fourth witness." The Appellate Court has twice taken note of the strong and overwhelming nature of the state's case against the petitioner, once in his direct appeal and a second time in his appeal following his first habeas trial, and we have no reason to disagree with those assessments of the evidence. See *Hilton* v. *Commissioner of Correction*, supra, 161 Conn. App. 76; *State* v. *Hilton*, supra, 79 Conn. App. 168.[4]

Although *Lapointe* did not alter a habeas court's function as the arbiter of credibility, it provides an important

[4]Although we reach the same result as the Appellate Court, our analysis differs in one important respect. We do not agree with the Appellate Court's holding that *Lapointe* is legally inapposite because it involved a claimed violation of *Brady* v. *Maryland*, 373 U.S. 83, 87, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963), whereas the petitioner in the present case asserted a *Strickland* claim. See *Hilton* v. *Commissioner of*

lesson to habeas courts, namely, that a habeas court must carefully scrutinize expert opinions and forensic science, and ensure that the factual record supports its ultimate credibility determination. We encourage habeas courts to articulate in detail, as the habeas court did in the present case, the way it assesses and finds an expert to be credible or not credible so that a reviewing court, if asked to apply *Lapointe*, can decide whether the record factually supports that credibility determination. The habeas court's assessment as to which expert, neither, or both, to credit often is determinative of a petitioner's claims. See, e.g., *Barlow* v. *Commissioner of Correction*, supra, 343 Conn. 367–68; *Skakel* v. *Commissioner of Correction*, 329 Conn. 1, 62, 188 A.3d 1 (2018), cert. denied, 586 U.S. 1068, 139 S. Ct. 788, 202 L. Ed. 2d 569 (2019). It is therefore important that habeas courts thoughtfully consider and deliberate on this type of evidence, as the habeas court did in the present case.

The judgment of the Appellate Court is affirmed.

In this opinion the other justices concurred.

---

*Correction*, supra, 225 Conn. App. 331, 337–40. The habeas claim at issue in *Lapointe* implicated both *Strickland* and *Brady* because the petitioner there asserted that habeas counsel had rendered ineffective assistance in violation of *Strickland* by failing to demonstrate that the state had improperly withheld exculpatory evidence in violation of *Brady*. See *Lapointe* v. *Commissioner of Correction*, supra, 316 Conn. 251. Moreover, a habeas court's predictive assessment is the same under both *Strickland* and *Brady* because "it is undisputed that the test for prejudice under *Strickland* is identical to the test for materiality under *Brady*." *Skakel* v. *Commissioner of Correction*, 329 Conn. 1, 40 n.16, 188 A.3d 1 (2018), cert. denied, 586 U.S. 1068, 139 S. Ct. 788, 202 L. Ed. 2d 569 (2019); see also *Jones* v. *State*, 328 Conn. 84, 102, 177 A.3d 534 (2018) (noting that appellate review of *Brady* claims and *Strickland* claims is same). Thus, although we agree that *Lapointe* does not impact the outcome of this case, it is not because of a distinction between *Strickland* and *Brady* in this context.